# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

KARLA HUAMAN, ON BEHALF OF HER MINOR
SON, "J.M.,"

    Plaintiff,

    v.

WOODROW TINSLEY, III, and the TOWN OF
EAST HARTFORD,

    Defendants.

No. 3:13–cv–484 (MPS)

## RULING ON POST-VERDICT MOTIONS

### I. Introduction

On the morning of November 15, 2012, East Hartford Police Officer Woodrow Tinsley, III, was dispatched to the apartment of Plaintiff Karla Huaman to assist a caseworker from the Connecticut Department of Children and Families ("DCF") in arranging for Huaman's troubled twelve-year-old son, J.M., to attend a psychological evaluation at the juvenile court. J.M. had committed no crime and posed no threat to anyone, but he did not budge that morning after Tinsley arrived at the apartment and urged him to get up from the couch, get dressed, and leave for the evaluation. Soon, Tinsley's "assist[ance]" turned into a forceful encounter, as Tinsley pulled J.M. across the floor of his home, and J.M.'s resistance precipitated a fight between J.M. and Tinsley. When the fight ended, J.M. was in handcuffs and under arrest for interfering with and assault on a police officer. Huaman sued Tinsley and others for false arrest, excessive force, and other claims, but after a trial, the jury found for defendants, apparently concluding, among other things, that Tinsley had had probable cause to arrest J.M. and had used only reasonable force against him.

On Huaman's motion for a new trial, I find that the jury's verdict on these claims was

1

against the weight of the evidence and that Tinsley is not entitled to qualified immunity. Tinsley's own testimony shows that, in dragging J.M. across the floor of his home to "assist" in ensuring that J.M. attended the evaluation, Tinsley used force that he lacked authority to use and that he did not reasonably believe was necessary to make an arrest or to protect himself or another. There was thus no basis for the jury to find that Tinsley was acting in the performance of his duties when J.M. engaged in the resistance that resulted in his arrest and, consequently, no basis to find probable cause that he was interfering with or assaulting an officer while in the performance of those duties. And because Tinsley used substantial force when the circumstances did not call for any, there was no basis for the jury to find that the amount of force he used was reasonable. No reasonable officer could have believed that dragging an unwilling child out of his home to attend a psychological evaluation—whether it was court-ordered or not—was authorized by clearly established law. I therefore order a new trial on the false arrest claim and the two state law claims involving probable cause—false imprisonment and malicious prosecution—as well as on the excessive force claim. I deny the motion for new trial as to the negligence and emotional distress claims, as the jury's verdict as to those claims was not against the weight of the evidence. I deny Huaman's motion for judgment as a matter of law because she failed to make a Rule 50(a) motion before the case was submitted to the jury.

## II. Background

### A. Procedural History

Huaman brought Fourth Amendment, state common law, and state statutory claims on behalf of J.M. against officers of the East Hartford Police Department (the former Chief of Police Mark Sirois, Police Sergeant Steven Syme, and Police Officers Kenneth Sullivan and Tinsley) and the Town itself. Before trial, Judge Dominic Squatrito dismissed the claims against Sirois, Syme,

and Sullivan and all claims against the Town except the claim under Conn. Gen. Stat. §52-557n for negligent infliction of emotional distress. (ECF No. 106 at 42.)  Remaining for trial were: (1) Human's claim under 42 U.S.C. § 1983 that Tinsley violated her son's Fourth Amendment rights to be free from excessive force and arrest without probable cause; (2) state law claims for malicious prosecution and false imprisonment against Tinsley; (3) claims for negligent and intentional infliction of emotional distress against Tinsley; and (4) a claim for negligent infliction of emotional distress against the Town under § 52-557n of the Connecticut General Statutes. The case was transferred to me for trial, and evidence before the jury began on September 14, 2016.

At the conclusion of Huaman's case, the defendants made a motion for judgment as a matter of law under Fed. R. Civ. P. 50(a), and I reserved ruling. At no time during the trial did Huaman make a Rule 50(a) motion.  The case was submitted to the jury, which returned a verdict for the defendants on all counts. Despite not filing a Rule 50(a) motion, Huaman has now filed a post-verdict motion for judgment as a matter of law under Rule 50(b), as well as a motion for a new trial under Rule 59. I held oral argument on the motions on August 17, 2017, and, at the conclusion of that argument, issued an oral ruling denying the plaintiff's Rule 59 motion on some of the grounds she raised—including alleged juror misconduct and allegedly improper conduct by defense counsel during closing argument. (ECF No. 167.)  This memorandum addresses the remaining arguments as well as Huaman's Rule 50(b) motion.

### B.     The Evidence at Trial

On November 15, 2012, Huaman's twelve-year-old son, J. M., had a 9:00 a.m. appointment for a psychological evaluation at the juvenile division of the Connecticut Superior Court in Hartford, Connecticut. (ECF No. 157 at 81–82; ECF No. 158 at 127.) J.M. had been diagnosed with both generalized anxiety disorder and a mild form of autism, and he had been truant from

school. (*Id.* at 21–24, 40–42; ECF No. 156 at 39.) J.M. was reluctant to leave the house, to interact socially, and even to see to his own hygiene; he spent most of his time playing video games. (ECF No. 158 at 18, 56, 68.)

At approximately 8:10 a.m. on November 15, 2012, Lisa Freeman, the DCF worker assigned to Huaman's family, arrived at Huaman's apartment. (*Id.* at 40; ECF No. 157 at 144–45.) Huaman had called Freeman the day before to tell her that J.M. did not want to go to the psychological evaluation. (ECF No. 156 at 41.) When she arrived at Huaman's apartment, Freeman found J.M. lying on a couch wearing only a pair of shorts. (*Id.* at 42; ECF No. 157 at 148.) Freeman and Huaman attempted to convince J.M. to attend his evaluation, but J.M. refused, saying that he was tired and did not want to go. (ECF No. 156 at 44.)

Freeman called the East Hartford Police Department and informed dispatch that she needed police assistance with a juvenile who was refusing to attend a psychological evaluation at the Superior Court in Hartford. (ECF No. 157 at 85–86.) Huaman agreed with Freeman on the decision to call the police. (ECF No. 156 at 43–44.)

Because, at this point, the parties' trial testimony substantially diverged, I set forth below each side's versions of events. I have reproduced Tinsley's testimony in detail because, as discussed below, the jury apparently credited it and I will defer to their credibility finding for purposes of this ruling.

### 1. *Officer Tinsley's Version of Events*

Tinsley, who by November 2012 had served as an East Hartford police officer for ten years (ECF No. 159 at 3), was dispatched to J.M.'s house after Freeman called for police assistance. (*Id.* at 3–5.) On his way there, Officer Tinsley received a call from his superior, Sergeant Syme. (ECF No. 157 at 195; ECF No. 159 at 19.) Syme was aware that Tinsley was responding to an assist call

from DCF. He testified at trial that he instructed Tinsley not to "take any action unless [he had] a Court order signed by a judge." (ECF No. 157 at 195–98; ECF No. 159 at 20.) Syme testified that he discussed this with Tinsley because, in situations where DCF calls the police for backup, the police are "limited in what [they] should be doing." (ECF No. 157 at 196.) Tinsley recalled the same conversation as follows:

> Q. . . . What's your recollection of your conversation with Sergeant Syme in this phone call?
> A.      He told me to not take any action unless I had a signed Court order.
> Q.      And what was your reaction to his telling you that?
> A.      I said okay.
> Q.      Now, at some point did you prepare a police report in this case?
> A.      I did.
> Q.      In that police report, did you mention your conversation with Sergeant Syme?
> A.      No.
> Q.      Why not?
> A.      I don't know. I didn't think it was relevant.
> Q.      Did you consider what Sergeant Syme said to you about the court order to be an order from him?
> A.      Yes. I explained to him that it was—he said don't take any action unless it's a court order. And then I referenced—I remember referencing the dispatch screen and telling him it says on the screen it's a court order. And he said okay.

(ECF No. 159 at 20–21.)

Upon Officer Tinsley's arrival Freeman told him that J.M. was scheduled for a court-ordered evaluation and handed Officer Tinsley a document labeled "Notice of Evaluation." (ECF No. 156 at 46; Exhibit 1.)  The document set forth the following text, which is shown below—in slightly cut-off form—as it appears in an entry on the Court's docket (ECF No. 74-4 at 2):

STATE OF CONNECTICUT
SUPERIOR COURT JUVENILE MATTERS
OFFICE OF THE CLERK
920 BROAD STREET
P.O. BOX 6219, STATION A
HARTFORD, CT 06106
(860) 244-7900


--KVILLE MANCHESTER DCF                                    NOVEMBER 6, 2012
WEST MIDDLE TURNPIKE
--CHESTER, CT 06040


NOTICE OF EVALUATION

H12-CP12-014593-A

r Social Worker,

ourt Ordered PSY COMBO (CLN-INTELL-P/C) Evaluation Has Been Scheduled With:

ce Freedman, PHD

edule:


US [REDACTED]       (CHILD) Thursday – November 15, 2012 AT 9:00AM to 2:00PM

th __oor Conference Ro920 BROAD STREET P.O. BOX 6219, STATION A HARTFORD CT

LA HUAMAN          (Mother) Thursday – November 15, 2012 AT 2:00PM to 3:00PM

th Floor Conference Ro920 BROAD STREET P.O. BOX 6219, STATION A HARTFORD CT

LA HUAMAN          (Mother) Thursday – November 15, 2012 AT 12:00PM to 1:00PM

th Floor Conference Ro920 BROAD STREET P.O. BOX 6219, STATION A HARTFORD CT

E [REDACTED]       (Father) Thursday – November 15, 2012 AT 2:00PM to 4:00PM

th Floor Conference Ro920 BROAD STREET P.O. BOX 6219, STATION A HARTFORD CT


DESIREE FERNANDEZ
COURT SERVICES OFFICER

The document also bore a date stamp "NOV 8 2012" as well as handwriting apparently referring to Lisa Freeman, the DCF worker, and a phone number. The document is not signed by a judge.

Tinsley testified about his understanding of the document at trial:

Q.    When you looked at this, this Notice of Evaluation, what did you make of it in terms of whether it was court ordered or not?
A.    I thought it was a valid court order.
Q.    There's no signature on this, is there?
A.    Desiree Fernandez I assumed was an electronic signature.
Q.    Do you know who Desiree Fernandez is?
A.    No, I never met it. [sic]
Q.    It says Court Services Officer?
A.    Court Services Officer.
Q.    Now, there's not a signature from a judge?
A.    Correct.
Q.    On this document, correct?
A.    Correct.
Q.    What did Lisa Freeman tell you in terms of what the significance of this document was?
A.    She said it was a court order for him to go.
Q.    And as far as you understood, was that a subject that a DCF social worker had reason to know?
A.    Yes. Yes, absolutely.
Q.    It's not a take into custody order, is it?
A.    No, no. She explained that, you know, he's got this court order to go and he has to go.
Q.    And it's not an arrest warrant?
A.    No.

(ECF No. 159 at 34–35.) On cross examination, Tinsley also stated:

Q.    Let me just show you the court order again. The Notice of Evaluation. And you can maybe demonstrate to the jury where in this document, Exhibit 1, gives you the legal basis to put this 12 year old disabled to be psychologically evaluated child in the back of your police car in handcuffs to go to the evaluation?
A.    So when I got there Lisa Freeman gave me this order and said it's a court order and and –
MR. BREWER: Objection, Your Honor.
THE COURT: He can finish his answer. Go ahead.
A.    So she gave me this order. She said it was a court order. She had told dispatch. It was on my screen. So I had different sources telling me it was a court order. And when I looked down and see the Desiree Fernandez, Court Services

Officer, I assumed that was an electronic signature. If you look at my police report it's got an electronic signature on it as well. That's how we do things now. And I just brought him to court. I assumed it was—this was an instruction for me to bring him to court or for him to go to court by any means necessary.

....

Q.  Officer Tinsley, where in the that document does it give you the authority to take this child into custody and take him to this evaluation, where does it say that?

A.  It's the fact that [I] was told that it was a court order that I had to enforce.

Q.  Where does it say that?

A.  It doesn't say it anywhere.

(*Id.* at 106–7.)

Further describing his arrival at the apartment, Tinsley testified:

Q.      Did you have any conversations with anybody there after you first entered into the apartment?

A.      Yes.

Q.      Tell us about that.

A.      I spoke to the mother—not the mother. Lisa Freeman. And she said that— she introduced me to [J.M.], this is [J.M.]. He has an appointment at nine o'clock and he needs—he's refusing to go.

Q.      Did you have any conversation with the mother?

A.      I believe she mentioned that he was just chronically truant at school.

Q.      Did you have any information with regard to psychological behavioral issues with [J.M.] as of that point that we're at so far?

A.      No.

Q.      Were you shown a notice from the court?

A.      Yes.

Q.      And what did that notice tell you?

A.      It said that he had a court ordered appointment at nine o'clock for a psych combo.

Q.      And did that give you any information about any potential psychological issues that the kid might have?

A.      Yes.

(ECF No. 159 at 30–31.)  Tinsley then spoke to J.M., who was sitting on the couch in a pair of

shorts:

Q.      Tell us about your interaction at that moment with [J.M.].

A.      So I said, you know, you got—I said you got to go to this appointment. I don't remember the exact wording I used, but it was like we got to go. He was sitting on a couch in a pair of shorts and he had a laptop in his lap. And he said he was too tired to go.

. . .

Q.      All right. He said he was too tired. Did he say anything else?

8

A.      I don't remember.

Q.      What did you say to him at that point?

A.      I said, you know, all right. Well, I'll give you two seconds then to get up and get some clothes on or we're just going to go like that.

Q.      What was in your mind when you said that to this young man?

A.      It was just—like the two second expression?

Q.      Yes.

A.      It was just an expression, something I would say to my own kids. Like, hey, I'll give you two seconds to clean your room or you're not getting dessert.

Q.      What was your tone of voice when you said that to him?

A.      Firm.

Q.      And did he make a response?

A.      He said two seconds is not enough.

Q.      Now, what was his tone of voice when he said that?

A.      He was kind of normal I guess.

Q.      Was he loud?

A.       No.

Q.      Screaming at you?

A.      No.

. . .

Q.      Would you characterize his response as belligerent at this point?

A.      It was a little sarcastic and belligerent, but he wasn't yelling.

Q.      Was he discourteous?

A.      Yes.

Q.      Was that the first time in your law enforcement career that an adolescent had been discourteous or sarcastic with you?

A.      No.

Q.      You've had a few interactions like that?

A.      Several.

. . .

Q.      What effect, if any, did Jesus's tone when he responded to your two second comment have on your mental state at the time?

A.      None.

Q.      You weren't mad at him?

A.      No, he's just a kid. He's young. He's just ignoring my instruction.

Q.      Did he give you any impression by his response as to how seriously he was or was not taking this situation?

A.      Yeah, he was not taking it seriously, that was my impression.

(ECF No. 156 at 31–35.) Then, Tinsley pulled J.M. off the couch and toward the door:

Q.      What did you do then?

A.      Then I went over to Jesus and I said, let's go, and I grabbed his arm—his left arm and pulled him off the couch.

Q.      Describe that for us. How did that come about that he got off the couch?

9

A.      So he was a big guy.[1]  So I grabbed his arm and I said let's go and then I pulled and he assisted me. I didn't pull him on to the floor and then lift him up. He got up with me and put his feet on the ground and started walking with me.

Q.      What was your intention at the time that you took a hold of his arm and lifted him up?

A.      My thought was that he would realize that it's, you know, all right now I have to go, the police officer's here, he's making me go, and then he would say, all right, I'll get clothes on.

Q.      Did that happen?

A.       No.

(*Id.* at 35–36.)

Tinsley testified that, after he started to pull J.M. to the door, J.M. began to resist:

Q.      Describe for us, please, what happened next after you got Jesus up and moving toward the door?

A.      So we started getting towards the door and I remember now he put his hands on the door and—he was walking with me at first and he seemed like he thought it was funny that I was pulling him to the door. And then once we got closer to the door he started to change his action and attitude and started to resist, and then he pushed up against the door.

Q.      What do you mean pushed up against the door?

A.      He put his hands on the door frame to keep himself from going out.

Q.      And in terms of your—first of all, where are you positioned during this?

A.      I'm right behind him and there's a dining room table to my right.

Q.      Are you holding on to him in any way?

A.      Yes.

Q.      Where?

A.      I don't remember. I remember I was holding on to him.

Q.      But not in a headlock?

A.      No, no.

Q.      Did you feel him tense up or something of that sort?

A.      Yes, yes.

Q.      And did he start to change in any way in his physical movements as you approached the door?

A.      Yeah. He became—he tensed up and became really agitated and was really fighting going out the door. He did not want to go.

Q.      He did not want to go out the door?

A.      No.

Q.      What was your intention as of that moment in terms of taking him out the door?

---

[1] There was trial testimony that J.M. was "chubby" in November 2012. (ECF No. 156 at 49.) Tinsley testified that that J.M. was "about five six, 200 pounds." (ECF No. 159 at 44.) Tinsley himself, however, was larger than that—from my own observation at trial, I estimate well over 6 feet and well over 250 pounds; Tinsley acknowledged at trial that "I'm obviously a big guy." (ECF No. 159 at 44.)

A.      We were going to—my intention was that, you know, by pulling him off the couch and starting towards the door we would—he would stop and go get clothes on. And that didn't happen. So it was—I didn't really have time for an intention at that point.

Q.      When his hand was on the door, did you take any action with respect to that?

A.      Yeah.  I pulled his – I pulled his hand off the door.

(*Id.* at 38–40.)

After Tinsley pulled J.M.'s hand from the door frame, J.M. turned around "and we were kind of squared off face to face and I was still trying to hold on to him." (Id. at 40.) Tinsley testified that J.M. then attempted to knee him. (ECF No. 159 at 40.) In response, Tinsley forced J.M. to the floor, using a "distractive strike," which he said was just powerful enough to help him gain control of the situation. (*Id.* at 42.) After they both were on the floor, Tinsley felt J.M. reaching for his duty belt—where he kept his gun, baton, and pepper spray. (*Id.* at 44.) Tinsley then used another distractive strike, placed his knee on J.M.'s neck, and handcuffed J.M. while J.M. was on the floor. (*Id.* at 46). He described this as standard procedure. (*Id.*) Tinsley left J.M. on the floor while he went to wash his hands. (*Id.* at 48.) Huaman and Freeman then dressed J.M., with his hands handcuffed behind his back. (*Id.* at 49.)

Tinsley brought J.M. outside to his police car, which was parked in front of Huaman's apartment. (ECF No. 156 at 54.) Tinsley placed J.M., still handcuffed, into the backseat. (ECF No. 159 at 49.) Huaman and Freeman also went outside. (ECF No. 156 at 54–56.) Another officer, Sullivan, arrived at Huaman's apartment in response to Tinsley's request for another unit. (ECF No. 157 at 203.) While Sullivan was speaking to J.M., Sergeant Syme also arrived on the scene and spoke with Tinsley about what had happened in Huaman's apartment. (*Id.* at 202–3.) Syme then went over to Tinsley's police car, where Sullivan was still talking to J.M. Tinsley provided Huaman with a summons that charged J.M. with Interfering with an Officer, in violation of Conn.

Gen. Stat. § 53a-167a, and Assault of Public Safety Personnel, in violation of Conn. Gen. Stat. § 53a-167c. (ECF No. 159 at 50, 52; Exhibit 2.) Tinsley discussed the summons with Syme before giving it to Huaman. (ECF No. 157 at 205.) Tinsley drove J.M. in the backseat of the police car to the psychological evaluation after issuing the summons. (ECF No. 159 at 53–55.)

### 2. *Huaman's and Lisa Freeman's Versions*

Huaman testified that after arriving at the apartment, Tinsley "walk[ed] up to [J.M.] and pull[ed] him by the arm up from the couch," "with force," and then "turn[ed] around and grabb[ed] [J.M.] and put[] him on [sic] a head lock position" and "start[ed] dragging him out of the apartment." (ECF No. 156 at 49.) She also stated that Tinsley "was punching [J.M.]" at that time. (*Id.* at 50.)

Lisa Freeman testified that Tinsley "yanked [J.M.] off the couch by his arms," "pulled him over to the door [with J.M.] dragging his feet," "pushed him up against the door and was attempting to open the door to lead [J.M.] out of the door," "forced [J.M.] to the floor and proceeded to . . . punch[ J.M.] in the face and stomach." (ECF No. 157 at 151–52.) Freeman stated that she "never saw [J.M.] in a headlock." (*Id.* at 177.)

## III. Analysis of Huaman's Post-Verdict Motions

### A. Rule 50 Motion

#### 1. *Legal Standards*

Fed. R. Civ. P. 50(a) permits the entry of judgment as a matter of law if a "party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue . . . ." If the court does not grant the motion made under Rule 50(a), "the movant may file a renewed motion for judgment as a matter of law" within 28 days from the entry of judgment or, if the motion concerns a matter not

decided by a verdict, within 28 days after discharge of the jury. Fed. R. Civ. P. 50(b).

A party who does not move for judgment as a matter of law under Rule 50(a) is barred from challenging the verdict under Rule 50(b). *Walling v. Holman*, 858 F.2d 79, 82 (2d Cir. 1988) ("Appellants are precluded from challenging the sufficiency of the evidence because they failed to move for a directed verdict at trial in accordance with Fed. R. Civ. P. 50(b)."). This procedural requirement "may not be waived by the parties or excused by the district court." *Bracey v. Bd. of Educ. of City of Bridgeport*, 368 F.3d 108, 117 (2d Cir. 2004). Nevertheless, a party who has failed to comply with the procedural requirements of Rule 50 is not foreclosed from challenging the verdict by means of a Rule 59 motion. *La France v. N.Y., N. H. & H. R. Co.*, 191 F. Supp. 164, 166 n.1 (D. Conn.), *aff'd*, 292 F.2d 649 (2d Cir. 1961) (treating defendant's motion as a motion made under Rule 59(a) because defendant was barred from bringing the motion under Rule 50(b)).

### 2. *Discussion*

Huaman did not move for a judgment as a matter of law before the case was submitted to the jury and thus is barred from making a Rule 50 motion following the jury verdict. The Second Circuit recognizes an exception to this rule only if needed to correct "manifest injustice." *Malmsteen v. Berdon, LLP*, 369 F. App'x 248, 249 (2d Cir. 2010), but Huaman's motion does not address this standard and analyzes the issue instead as if she had made a Rule 50(a) motion. Only in her reply brief—after the defendants point out that she failed to make a Rule 50(a) motion—does Huaman address the "manifest injustice" standard. (*See* ECF Nos. 150-1, 154.) It is improper to raise issues for the first time in a reply brief, and Huaman provides no reason why she should be excused from her failure to comply with Rule 50. *See Cotto v. City of Middletown*, 158 F. Supp.3d 67, 87 n.10 (D. Conn. 2016) (internal citation omitted). Accordingly, her Rule 50 motion is DENIED.

### B. Rule 59 Motion

#### 1. *Legal Standards*

Fed. R. Civ. P. 59(a) permits a district court to grant a new trial "when the jury's verdict is against the weight of the evidence." *DLC Mgmt. Co. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998). "In contrast to a motion for judgment as a matter of law, a motion for a new trial pursuant to [Rule] 59 may be granted by the district court, although there is evidence to support the jury's verdict, so long as the district court determines that, in its independent judgment, the jury has reached a seriously erroneous result or its verdict is a miscarriage of justice." *Nimely v. City of New York*, 414 F.3d 381, 392 (2d Cir. 2005) (alterations, citation, and internal quotation marks omitted). "[O]n a Rule 59 motion the court may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner." *ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 99 (2d Cir. 2014) (internal quotation marks omitted). However, "a high degree of deference is accorded to the jury's evaluation of witness credibility, and . . . jury verdicts should be disturbed with great infrequency." *Id.*

#### 2. *Parties' arguments*

In support of her Rule 59 motion, the plaintiff argues that Tinsley's "use of force and arrest [were] 'unreasonable' and in violation of the Fourth Amendment." (ECF No. 150–1 at 1.) She contends that "[t]he indisputable evidence at trial was that Tinsley had no legal basis to use force against [J.M.], or to arrest [J.M]." (*Id.*) The defendants argue that the "plaintiff's legal arguments merely invite this Court to credit her disputed version of relevant events—a version flatly rejected by the jury." (ECF No. 153 at 6.) They assert that the jury simply believed Tinsley's version of events, rather than Huaman's. (*Id.* at 7.)

I agree with the defendants that the jury's verdict indicates that it found Tinsley's version

of events more credible, and, because the jury's credibility determination is entitled to "a high degree of deference," I will credit Tinsley's testimony, where there is conflicting evidence. I observed the witnesses at trial, and I did not reach a firm conclusion that either side's witnesses were lying or obscuring the truth; instead, each witness had a different perspective on an intense, fast-moving situation, and the jury found Tinsley's version to be more credible than Huaman's.

### 3. Discussion

Three of the plaintiff's claims against Tinsley have a probable cause requirement: (1) false arrest, (2) false imprisonment, and (3) malicious prosecution. Because I find that the jury's determination that Tinsley had probable cause to arrest J.M. was against the weight of the evidence, I GRANT the Rule 59 motion as to these three claims. I also find that the jury's determination that Tinsley did not use excessive force during his encounter with J.M. was against the weight of the evidence, and so I GRANT the Rule 59 motion on that claim as well. I DENY the Rule 59 motion as to the other claims against Tinsley and the Town.

#### a. False arrest

With respect to Huaman's claim that Tinsley falsely arrested J.M., I instructed the jury that, to prevail on this claim, she had to prove:

> (1) that the defendant officer intentionally arrested him or had him arrested;
> (2) that the plaintiff's son was aware of the arrest;
> (3) there was no consent to the arrest;
> (4) that the arrest was not supported by probable cause; and
> (5) that the underlying criminal proceeding terminated in favor of the plaintiff's son.

(ECF No. 139 at 21); *Weinstock v. Wilk*, 296 F. Supp. 2d 241, 246 (D. Conn. 2006). The parties stipulated at trial that the underlying proceeding terminated in favor of J.M., and there was no dispute that J.M. was aware of the arrest and did not consent to it (either on his own or through

Huaman). (ECF No. 158 at 125).[2] The issue was thus whether, at the time Tinsley intentionally arrested J.M., the arrest was supported by probable cause.

Tinsley testified that he did not intend to arrest J.M. initially and that he did not form an intent to arrest J.M. until after J.M. attempted to knee him in the groin. (ECF No. 159 at 50, 97, 118–19.) His testimony makes clear that he intentionally arrested J.M. for violation of both Conn. Gen. Stat. §§ 53a-167a and 53a-167c in the moments after J.M. attempted to knee him. (ECF No. 159 at 28, 119–20.) I assume that the jury credited this testimony and, as noted, I will defer to its determination. The jury was instructed that it should focus on the moment of arrest in deciding whether the arrest was supported by probable cause, and I assume that it followed these instructions.[3] *Lifetime Siding, Inc. v. United States*, 359 F.2d 657, 661 (2d Cir. 1966) ("We must assume that the jury followed the court's instructions, absent any indication to the contrary.") I thus must decide whether, at the time J.M. attempted to knee him, the weight of the evidence showed that Tinsley had probable cause to arrest J.M.[4]

---

[2] Although defendants argue in their supplemental brief that Huaman acquiesced in Tinsley's subsequent transportation of J.M. to court—once he was in the back of the cruiser in handcuffs (ECF No. 170 at 7, n. 2)— it is not necessary to address this issue because J.M. had already been arrested by that time. (ECF No. 159 at 51.)

[3] The jury instructions stated: "To determine whether the defendant officer falsely arrested the plaintiff's son in this case, you must determine whether the defendant officer had probable cause to arrest him for the crimes with which the plaintiff's son was charged . . . . To be guilty of either interfering with a police officer or assaulting a police officer, the police officer must have been acting in the performance of his duties at the time of the interference or assault." (*Id.* at 23–24); (*See also id.* at 29) (explaining that "[i]n a malicious prosecution claim" by contrast to a false arrest claim, "the existence or lack o[f] probable cause is measured as of the time the evidence proceedings are begun, not at the time of arrest").

[4] In her supplemental brief, Huaman argues that the evidence showed that Tinsley falsely arrested J.M at two other times—when he pulled J.M. from the couch and when he kept J.M. handcuffed in the back of the cruiser and drove him to court even after giving Huaman a summons. This argument suffers from two fatal flaws. First, Huaman never made this argument at trial, and the probable-cause-related claims were not presented in such narrow slices. To the contrary, Huaman relied on the entire sequence of events to support her claims. Second, at both of those times, Tinsley lacked the intention to arrest J.M., according to his testimony, and thus could not be said to have "intentionally arrested J.M." at those times. He testified that when he pulled J.M. from the couch, his intention was that J.M. would become motivated to get dressed and leave voluntarily for the psychological appointment, and that the final act of transporting J.M. to court was designed to ensure that J.M. attended the "court-ordered" appointment as well. (ECF No. 159 at 36, 105–6.) He testified that he did not intend to arrest J.M. until after J.M. attempted to knee him in the groin. (*Id.* at 120.)

i.   Jury Instructions on Probable cause

For the probable cause analysis, I instructed the jury that

> [p]robable cause to arrest exists when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.

(ECF No. 139 at 22.) Further, because probable cause is offense-specific, I also instructed the jury

on the elements of the crimes for which Tinsley arrested J.M.: (1) interfering with a police officer

in violation of Conn. Gen. Stat. § 53a-167a; and (2) assaulting a police officer in violation of Conn.

Gen. Stat. § 53a-167c:

> *To be guilty of either interfering with a police officer or assaulting a police officer, the police officer must have been acting in the performance of his duties at the time of the interference or assault.* The phrase "in the performance of his duties" means that the police officer is acting within the scope of what he is employed to do. That is, an officer is acting in the performance of his duties if he is acting under a good faith belief that he is carrying out those duties, and if the actions employed by him are reasonably designed to that end. *However, if an officer uses physical force and does not reasonably believe that his use of physical force was necessary under the circumstances to make an arrest or defend himself or a third person from the use of force by another, or if he knows that an arrest or custody is unauthorized, then his use of force is not within the performance of his duties and the arrestee is permitted to resist that use of force.*
>
> An arrestee is not, however, permitted to use physical force to resist an arrest by a police officer just because the arrest is illegal. An arrestee is permitted to use physical force to resist an arrest only when the officer uses force that the officer does not reasonably believe is necessary, i.e., only when the officer is not acting in the performance of his duties. A person is not required to submit to the unlawful use of physical force during the course of an arrest. This is true whether the arrest itself is legal or illegal.
>
> Therefore, to decide whether the defendant officer had probable cause to arrest the plaintiff's son for the crime of interfering with an officer or the crime of assault on an officer, one of the issues you must decide is whether the defendant officer was acting within the performance of his duties during his interaction with the plaintiff's son.  If you find that the defendant officer was not acting in the performance of his duties, then you must find he lacked probable cause and thus that the plaintiff has

proven her claim of false arrest. If you find that he was acting in the performance of his duties, you must go on to consider the other elements of the crimes to decide whether the defendant officer had probable cause to believe that the plaintiff's son committed a crime under all of the circumstances.

(ECF No. 139 at 24) (emphasis added.)

These instructions were based in part on the Connecticut Supreme Court's decision in *State v. Davis*, 261 Conn. 553 (2002). In *Davis*, which involved a prosecution for assault on a police officer and interfering with a police officer, the court reversed the conviction on the basis of the trial court's erroneous jury instructions. The Supreme Court held that the trial court should have instructed the jury as to the "performance of duties" element in both Section 53a-167a and Section 53a-167c by directing it to apply Conn. Gen. Stat. § 53a-22(b). *Davis*, 261 Conn. at 570. That statute provides that a police officer "is justified in using physical force upon another person when and to the extent that he or she reasonably believes such to be necessary to: (1) Effect an arrest or prevent the escape from custody of a person whom he or she reasonably believes to have committed an offense, unless he or she knows that the arrest or custody is unauthorized; or (2) defend himself or herself or a third person from the use or imminent use of physical force while effecting or attempting to effect an arrest or while preventing or attempting to prevent an escape." Conn. Gen. Stat. § 53a-22(b); *see Davis*, 261 Conn. at 570 (quoting statute). The *Davis* court added that "[i]f the police officer does not reasonably believe that his use of physical force is necessary, then his use of force is not within the performance of his duties and a citizen may properly resist that use of force." *Id.* at 571. The court also explained Conn. Gen. Stat. § 53a-23, Connecticut's statute abrogating the common law right to resist illegal arrests:

[U]nder § 53a-23, the illegality of an arrest is not a defense to charges under either § 53a-167a or § 53a-167c. . . . [T]he rationale for § 53a-23 is that the question of whether an arrest is legal or illegal (i.e. whether there is probable cause therefor) is usually a very difficult factual question; that the [common law rule permitting resisting an illegal arrest] invites violence; and that it is better social policy to require the arrestee to submit and challenge the arrest in court, rather than to permit

him to use force at the place of the arrest subject to a later judicial determination of the legality of the arrest.

*Id.* at 567. The Court added that "[t]his statutory abrogation of the common-law privilege to resist arrest is limited, however, to illegal *arrests*, per se, and has not been applied to other illegal police conduct." *Id.* (emphasis added). "§ 53a-23 was not intended to require the defendant to submit to unlawful police conduct when there had been *no attempted arrest*." *Id.* at 568 (emphasis added).

        ii.  Tinsley Was Not Acting in the Performance of His Duties When He Sought to Arrest J.M.

I find that the jury's apparent conclusion that Tinsley was acting in the performance of his duties at the time of arrest was against the weight of the evidence. In the moments before J.M. attempted to knee him, Tinsley used physical force that he did not reasonably believe was necessary under the circumstances to make an arrest or protect himself or another. His own testimony makes this clear. First, he admitted that he had no reason to believe that Jesus had committed a crime or posed a threat to anyone when he pulled him off the couch and that he had no arrest warrant or take-custody order that might have authorized him to use force. (ECF No. 159 at 35, 80–87). Second, even considering only Tinsley's testimony, it is clear that, at some point between the couch and the door, J.M. began to resist and Tinsley began to apply enough force to overcome that resistance. (ECF No 159 at 38–40) ("And then once we got closer to the door [J.M.] started to change his action and attitude and started to resist, and then he pushed up against the door.") ("[H]e tensed up and became really agitated and was really fighting going out the door. He did not want to go [out the door].") ("I pulled his hand off the door.")[5] He had no authority to

---

[5] Adding Lisa Freeman's testimony to the mix—as the *defendants* at times urge me to do (ECF No. 153 at 9) (describing Ms. Freeman as "an unbiased, trained observer" and arguing that "the jury was entitled to credit Ms. Freeman's testimony and disregard that of plaintiff.")—only underscores the force Tinsley used on the way from the couch to the door. Freeman testified that Tinsley "yanked [J.M.] off the couch by his arms," "pulled him over to the door [with J.M.] dragging his feet," and "pushed [J.M.] up against the door and was attempting to open the door to lead J.M. out the door." (ECF No. 157 at 150–52.).

do so. Even he admitted that he knew that the "Notice of Evaluation"—which he viewed as a court order—was not an arrest warrant or a take-custody order (*id.* at 34–35); and the notice made no mention of arrest, custody, seizure, force, or even penalties for failure to appear. (*See* Ex. 1.)[6] Nonetheless, when J.M. "started to change his action and attitude and . . . to resist" and "tense up", Tinsley kept pulling him toward the exit. (ECF No. 159 at 38–39.) Then, when J.M. pushed his hand against the doorframe to resist being pulled out the door, Tinsley pulled his hand off the door. None of these uses of force were "in the performance of his duties" under *Davis* and Conn. Gen. Stat. § 53a-22(b), because Tinsley was using force he did not reasonably believe was necessary to make an arrest or to protect himself or another. As noted, Tinsley had no intention of making an arrest at this time (and no basis to do so, as he acknowledged); he did not form that intention until J.M. turned around—after Tinsley had pried his hand off the door—and attempted to knee Tinsley. (ECF No. 159 at 119.) And there was no evidence that, during the trip from the couch to the door, J.M. posed a threat to Tinsley or anyone else or committed any crime. Thus, in the moments leading up to the knee strike, when Tinsley was dragging this 12-year-old boy across his living room floor and pushing him out the door in his shorts, Tinsley was not acting in the performance of his duties. The knee strike did not provide probable cause because, as I instructed the jury, "[t]o be guilty of either interfering with a police officer or assaulting a police officer, the police officer *must have been acting in the performance of his duties at the time of the interference or assault*." (ECF No. 139 at 24 (emphasis added).) The jury's apparent finding that Tinsley was acting in the performance of his duties when J.M. attempted to knee him was against the weight of the evidence.

Nor can the verdict be saved by reference to my instruction that "an arrestee is not . . .

---

[6] Although he initially testified that he thought the notice of evaluation was "an instruction for me to bring him to court or for him to go to court by any means necessary," Tinsley later admitted that the "notice" did not say that he could "take this child into custody and take him to this evaluation." (ECF No. 159 at 106–7.)

permitted to resist an arrest by a police officer just because the arrest is illegal," which reflected Conn. Gen. Stat. § 53a-23. (ECF No. 139 at 25.) At the time J.M. began to resist—according to Tinsley's testimony—he was not resisting *arrest*, because Tinsley had formed no intention to arrest him. Tinsley was, instead, intending to drag J.M. across the floor and, apparently, out the door in his shorts. (ECF No. 159 at 38, 88.) Because I assume that the jury credited Tinsley's testimony that no decision to arrest was made, and no arrest attempted, until after the knee strike, it would have been against the weight of the evidence for the jury to find that J.M.'s "chang[ing] his action and attitude and start[ing] to resist" being pulled across the floor constituted resistance of an arrest by an arrestee. *Davis*, 261 Conn. at 568 ("§ 53a-23 was not intended to require the defendant to submit to unlawful police conduct when there has been no attempted arrest.").

b. <u>False imprisonment</u>

Huaman's claim of false imprisonment also required her to prove that Tinsley lacked probable cause. As I instructed the jury, to prevail on this claim, Huaman had to prove:

(1) that the plaintiff's son's physical liberty was restrained by the defendant officer;
(2) that the restraint was against his will, that is, that he did not consent to the restraint or acquiesce in it willingly;
(3) that the defendant officer acted with the purpose of imposing a confinement or with knowledge that such confinement would, to a substantial certainty, result from his actions;
(4) that the plaintiff's son was conscious of the confinement when it occurred or that he was harmed by the confinement; and
(5) that the defendant officer lacked probable cause.

(ECF No. 139 at 27–28.) Because the absence of probable cause is an element of this claim, and because the jury's determination that there was probable cause was against the weight of the evidence, a new trial is necessary on this claim too. There is no dispute that, when Tinsley put handcuffs on J.M.: (1) Tinsley restrained J.M.'s liberty (ECF No. 159 at 46); (2) J.M. did not consent or acquiesce willingly to the arrest—the arrest resulted from his struggle against Tinsley

(*id.* at 40–46); (3) Tinsley intended to arrest J.M. for interfering with an officer and assaulting an officer (*id.* at 51); and (4) J.M. knew that he was being arrested and placed in handcuffs. (ECF No. 158 at 125.) That leaves only the probable cause element in dispute and, for the reasons discussed above, the jury's finding on that element was against the weight of the evidence.

### c. Malicious prosecution

The malicious prosecution claim also required Huaman to prove that Tinsley lacked probable cause, and a new trial is thus necessary on this claim, too, although the analysis is slightly more complicated. The Court instructed the jury that the elements of a malicious prosecution claim are:

(1)     that the defendant officer initiated or continued criminal proceedings against the plaintiff's son;
(2)     that the defendant officer did it without probable cause;
(3)     that the defendant officer did it with malice; and
(4)     that the criminal proceeding terminated in favor of the plaintiff's son.

(ECF No. 139 at 28.) I instructed the jury that they should "find the first and fourth elements proved." (*Id.*)

There are two complications with respect to the malicious prosecution claim. First, probable cause is assessed at a different moment in time than for a false arrest claim. *Lombardi v. Myers*, 14–cv–1687 (VAB), 2016 WL 4445939, at *4 (D. Conn. Aug. 18, 2016) (citations omitted); *Coll v. Boisvert*, 12–cv–1202 (JCH), 2014 WL 508694, at *8 (D. Conn. Feb. 5, 2014). But this distinction turns out to be immaterial in this case, because there was no evidence that Tinsley received additional information bearing on probable cause between the time of the arrest and the time he initiated charges against J.M. *Goff v. Chivers*, 15–cv–722 (SALM), 2017 WL 2174404, at * 14 (D. Conn. May 17, 2017) (where police arrested suspect for violation of § 53a-167 during roadside stop, transported suspect to state police barracks, and then charged suspect, a

lack of probable cause at the time of the arrest was also a lack of probable cause at the time of prosecution because there was no evidence that the police gathered additional information before charges were filed).

The second complication is that this claim also requires a showing of malice, and it is possible that the jury decided this claim in Tinsley's favor because it found no evidence of malice. Nonetheless, even if the jury did decide on this ground, I cannot be sure that its faulty probable cause determination did not taint its verdict, because I instructed the jurors that they could "infer malice from a lack of probable cause." (ECF No. 139 at 29); *see Berry v. Marchinkowski*, 137 F. Supp.3d 495, 536 (S.D.N.Y. 2015) ("[I]t is clear that, in the Second Circuit, a jury may infer malice from the absence of probable cause." (citing cases)). Because the jury's determination that there was probable cause was against the weight of the evidence and because the jury was allowed to infer malice from a lack of probable cause, I must order a new trial on the malicious prosecution claim as well.

### d. Excessive Force

Huaman also argues that the jury's verdict for Tinsley on the excessive force claim was against the weight of the evidence because Tinsley's testimony regarding his use of force was not credible. (ECF No. 150-1 at 4–10; ECF No. 168 at 5–6.) Again, however, the jury disagreed, and I will defer to its apparent determination that Tinsley's testimony was more credible than Huaman's.

Even according to Tinsley's version of events, however, he used excessive force. As already discussed, Tinsley grabbed J.M. from the couch and pulled him towards the door, even if J.M. was initially "walking with" him. (ECF No. 159 at 35, 38–39.) When J.M. began to stiffen up as they got closer to the door, Tinsley continued to maintain his grip on J.M. and must have

increased the amount of force he was using to overcome J.M.'s resistance and "tens[ing] up." He also forcibly pried J.M.'s hand loose from the doorframe. (*Id.* at 38–40.)

The Court instructed the jury:

> To determine whether the defendant officer's acts caused the plaintiff's son to suffer the loss of the Fourth Amendment right to be free from excessive force, you must determine whether the amount of force used was that which a reasonable officer would have employed under similar circumstances. In making this determination, you may take into account such factors as the severity of the crime at issue, whether the plaintiff's son posed an immediate threat to the safety of the defendant officer or others, whether the plaintiff's son actively resisted arrest, the relationship between the need for the use of force and the amount of force used, the extent of the injury that was inflicted upon the plaintiff's son by the defendant officer, and any efforts made to temper the severity of a forceful response.
> ….
> I must caution you that not every push or shove, even if it may later seem unnecessary in the peace of a courtroom, violates a plaintiff's constitutional rights, provided that the amount of force used by the police officer in question was within the range of force that a reasonable officer would have used under the circumstances. Only unreasonable force is prohibited.

(ECF No. 139 at 19–20, 21.) This instruction reflects the Supreme Court's teachings on excessive force in *Graham v. Connor*, 490 U.S. 386, 395 (1989), as well as Second Circuit case law holding that the "reasonableness inquiry depends only upon the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision" to use a particular amount of force. *Salim v. Proulx*, 93 F.3d 86, 92 (2d Cir. 1996).

This case, of course, involved an application of force under circumstances in which there was no probable cause to believe a crime was committed. Addressing force used to make arrests not supported by probable cause, the Second Circuit rejected the notion that "any force used in an arrest lacking probable cause is *per se* excessive," finding instead that "the reasonableness test established in *Graham* remains the applicable test for determining when excessive force has been used, including those cases where officers allegedly lack probable cause to arrest." *Jones v. Parmley*, 465 F.3d 46, 62 (2d Cir. 2006).

Under the *Graham* reasonableness test, however, "police are not permitted to use any degree of force in all instances—in some circumstances, no use of force is reasonable because *none is required.*'" *Weather v. City of Mount Vernon*, No. 08 CIV. 192 RPP, 2011 WL 1046165, at *9 (S.D.N.Y. Mar. 22, 2011), *aff'd*, 474 F. App'x 821 (2d Cir. 2012) (internal alterations omitted) (emphasis added); *see also Piper v. City of Elmira*, 12 F.Supp.3d 577, 588 (W.D.N.Y. 2014); *Bauer v. Norris*, 713 F.2d 408, 412–413 (8th Cir. 1983) ("The use of any force by officers simply because a suspect is argumentative, contentious, or vituperative is not to be condoned."); *United States v. Harrison*, 671 F.2d 1159, 1162 (8th Cir. 1982) ("Even if [an arrestee's] injuries were minor, a lack of provocation or need to use force would make any use of force excessive."). "Accordingly, the actions of the officers must be judged against the purported justification for the use of force under the circumstances and a defendant may be liable if the force used exceeded the force needed for the factual circumstances." *Piper*, 12 F. Supp.3d at 588 (internal quotation marks and citations omitted). "[A]lthough the *Graham* test does not consider the subjective intent of the officer(s) per se, . . . intentional, gratuitous uses of force that are not required to subdue an individual likely fail the *Graham* objective unreasonableness test." *Lemmo v. McKoy*, No. 08–CV–4264 RJD, 2011 WL 843974, at *6 (E.D.N.Y. Mar. 8, 2011).

The weight of the evidence at trial showed that, during the trip from the couch to the door and up to the moment of J.M.'s knee strike,[7] Tinsley used excessive force. As already shown, while

---

[7] The analysis focuses on the exact moment when the officer begins to use force—meaning that "the actions leading up to the [contested use of force] are irrelevant to the objective reasonableness of [the] conduct at the moment [the officer] decided to employ [the] force." *Salim*, 93 F.3d at 92. "The reasonableness inquiry depends only upon the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force." *Id.* Thus, a determination by the jury that Officer Tinsley's uses of force *after* J.M. attempted to knee him were reasonable would not have been against the weight of the evidence. At that point, Officer Tinsley stated that he perceived a need to protect himself and remain in control of the situation, and, based on this evidence, the jury's determination to accept that explanation would not have been seriously erroneous. (*See* ECF No. 159 at 40–47.) But by rendering a verdict for Tinsley on the excessive force claim, the jury must have found that all of his uses of force—during the entire sequence of events—were reasonable, and this finding was against the weight of the

J.M. was sitting on the couch, he had committed no crime and posed no threat, and even Tinsley did not believe there was a basis to arrest him or take him into custody. (*See* ECF No. 159 at 30–33, 79–80; ECF No. 170 at 6.) Thus, at least on the way from the couch to the door, J.M was not resisting arrest. Tinsley's application of force against J.M. once he began to resist the movement towards the door exceeded "that amount of force [that was] objectively reasonable under the circumstances to accomplish the officer's legitimate law enforcement objectives, including self-protection or protection of others." (ECF No. 139 at 20.) There was no justification for Tinsley to have used the force that he did; under these circumstances, any amount of force was excessive. *Weather*, 2011 WL 1046165, at *11. This is not simply because there was no probable cause to believe J.M. had committed a crime; as the Second Circuit noted in *Jones*, even under those circumstances, there might still be a threat to the safety of an officer that would justify the use of force, *Jones*, 465 F.3d at 62 (criticizing interpretation of an earlier decision as too broad "because it would appear to suggest that any force employed by a police officer would be unlawful so long as probable cause did not exist, even if the detainee had threatened the officer with significant harm"); or, as in *Robison v. Via*, interference with an officer's carrying out of his duties. 821 F.2d at 913, 922 (stating that Robison was interfering with officers' lawful actions in attempting to remove children from home because "there was an objectively reasonable basis for [the officers] to believe there existed a threat to the health and safety of the Robison children"). But here, as explained, no such circumstances existed—instead, the officer merely faced a child who did not want to attend an appointment.

Defendants argue that Tinsley's pulling J.M. from the couch to the door constituted a *de minimis* use of force and thus cannot be excessive. They rely on several cases in the Second Circuit

---

evidence. Although "[t]he harm proximately caused by [distinct alleged Fourth Amendment violations] may overlap," "the two claims should not be confused." *Cty. of Los Angeles, CA v. Mendez*, 137 S. Ct.1539, 1548 (2017).

holding that *de minimis* uses of force did not constitute Fourth Amendment violations. But the defendants in these cases all were making *arrests*. *See Torres v. Town of Bristol*, 3:13–cv–1335 (SRU), 2015 WL 1442722, at *2–4 (D. Conn. 2015) (plaintiff was arrested for heroin in plain view during traffic stop); *Rodriguez v. Village of Ossining*, 918 F. Supp. 2d 230, 238 (S.D.N.Y. 2013) (plaintiff was arrested for outstanding bench warrants); *Phelps v. Szubinski*, 577 F. Supp. 2d 650, 651–52 (E.D.N.Y. 2008) (plaintiff arrested for speeding and driving with an invalid license); *Jennejahn v. Village of Avon*, 575 F.Supp.2d 473, 476, 481 (W.D.N.Y. 2008) (plaintiff arrested for harassing conduct to neighbors). An arrest or detention almost inevitably involves some use of force by the police and thus some risk of injury to both the police and the arrestee or detainee. *See Muehler v. Mena*, 544 U.S. 93, 98–99 (2005) (stating in the search warrant context that "[i]nherent in [an officer's] authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention"). Here, however, Tinsley was not arresting J.M. as he dragged him to the door—or even making a *Terry* stop based on reasonable suspicion of a crime—and so cases involving arrests and detentions are not analogous. Assisting a DCF worker to convince a 12-year-old to attend a psychological evaluation—or providing backup *in the event* the child poses a threat—simply does not carry the same need for the use of force as does the apprehension or investigation of crime, at least, as in this case, if no threat materializes. And, as already noted, Tinsley was not acting under authority to take anyone into custody, and there was no basis to believe that there was a threat to anyone's safety. (ECF No. 159 at 30–33, 79–80); *see Robison*, 821 F.2d at 922. Thus, there was no need and no lawful basis to use the amount of force Tinsley applied in dragging J.M. from the couch to the door and prying his hands from the doorframe.

Nor does the fact that J.M. may not have suffered significant injury from Tinsley's actions

save the verdict here. The Second Circuit allows a plaintiff to recover, "even though the injury caused was not permanent or severe where the force used was excessive." *Lemmo*, 2011 WL 843974, at *6; *see also Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) (noting in part that "we have permitted a plaintiff's claim to survive summary judgment on allegations that, during the course of an arrest, a police officer twisted her arm, 'yanked' her, and threw her up against a car, causing only bruising") (citing *Robison*, 821 F.2d at 923–24). In fact, *Graham* itself makes the "extent of the injury" a *factor* in the analysis, but not a dispositive element. *Graham*, 490 U.S. at 390, 397–99 (1989). Where the circumstances call for no application of force, such that the other *Graham* factors weigh heavily against the officer's actions, an excessive force claim can still survive where any injuries are minor. *See Barcomb v. Kraeger*, 3:14–cv–1159 (JBA), 2016 WL 2644885, at *4–5 & n.8 (D. Conn. 2016) (rejecting more-than-de-minimis injury requirement for Fourth Amendment excessive force claim and stating that the "core judicial inquiry is not whether a certain quantum of injury was sustained but rather whether unreasonable force was applied given the circumstances" (interal citations and quotation marks omitted)); *see also Jackson on Behalf of Z.J. v. City of Middletown*, No. 3:11–cv–00725 (JAM), 2017 WL 2218304, at *4 (D. Conn. May 19, 2017) ("Because a plaintiff alleging an excessive force claim under the Eighth Amendment need not demonstrate a more-than-de-minimis injury, it necessarily follows that there is no basis to conclude that a Fourth Amendment claim for excessive force requires proof of more than a de minimis injury" because "the Supreme Court has otherwise made clear that the governing standard under the Eighth Amendment is even less protective of a plaintiff than the standard under the Fourth Amendment." (internal quotation marks omitted) (citing

*Graham*, 490 U.S. at 398)).[8]

For these reasons, the jury's verdict on the excessive force claim was against the weight of the evidence.

### e. Qualified immunity

My finding that the jury's verdict on these claims was against the weight of the evidence raises the question whether Tinsley is nevertheless entitled to qualified immunity, because if he is, I would not order a new trial on the Section 1983 claims.[9] I thus now turn to the question whether qualified immunity protects Tinsley for the actions he took.

Qualified immunity protects a government official from liability for damages unless his actions violate a "clearly established statutory or constitutional right of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). More specifically, Tinsley is entitled to qualified immunity (1) "if [his] actions did not violate clearly established law" or (2) if "it was objectively reasonable for [him] to believe that [his] action did not violate such law." *Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir. 2007) (internal citations omitted).

---

[8] The amount of force Tinsley used in dragging J.M. to the door is comparable to that in *Robison*. 821 F.2d at 923–24. ("[The plaintiff] testified that Harrison pushed her against the inside of the door of her car, yanked her out, threw her up against the fender, and twisted her arm behind her back. Robison testified that she suffered bruises lasting a couple weeks. We have held that assertions such as these are sufficient to prevent the summary dismissal of a § 1983 claim for excessive force.") (internal alterations and citation marks omitted). It is true that the bruises that J.M. sustained (ECF Nos. 157 at 26, 164, 158 at 91), based on Officer Tinsley's testimony, likely were the result of Tinsley's reaction to the attempted knee strike, which, as noted (*see supra* note 7), may not have been excessive force. However, these bruises still may be regarded as proximate results of Tinsley's initial, unconstitutional use of force — because it was reasonably foreseeable that J.M. might resist Tinsley—and, therefore, would constitute recoverable damages *See Cty. of Los Angeles, CA v. Mendez*, 137 S. Ct.1539, 1548 (2017) ("[P]laintiffs can—subject to qualified immunity—generally recover damages that are proximately caused by any Fourth Amendment violation."); *Conroy v. Caron* No. 3:14–cv–01180 (JAM), 2017 WL 3401250, at *8 n.5 (D. Conn. Aug. 8, 2017) ("[T]o the extent that later events were proximately caused by the officers' unlawful entry into the family garage, the independent lawfulness of these later actions may be of only academic interest.").

[9] The qualified immunity analysis is limited to the false arrest and excessive force claims; the jury was instructed that the other probable-cause-related claims, false imprisonment and malicious prosecution, arose under state common law rather than the Fourth Amendment. (ECF No. 139 at 17); *see Mawhirt v. Ahmed*, 8 Fed. Appx. 125, 127 (2d Cir. May 17, 2001) ("Because a violation of state law is not cognizable under § 1983, the federal law doctrine of qualified immunity does not apply to state law claims . . . ." (internal quotation marks and citation omitted)).

i. False Arrest Claim

1. Clearly Established Law

The Fourth Amendment right not to be arrested without probable cause is clearly established. *Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997). But the analysis of whether clearly established law existed must "consider whether a reasonable officer could have believed that the *specific action* taken by the defendant was foreclosed by clearly established law." *Caldarola v. Calabrese*, 298 F.3d 156, 161 (2d Cir. 2002) (emphasis added); *see also White v. Pauly*, 137 S. Ct. 548, 552 (2017) ("Today, it is again necessary to reiterate the longstanding principle that clearly established law should not be defined at a high level of generality. As this Court explained decades ago, the clearly established law must be particularized to the facts of the case. Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." (internal citations and quotation marks omitted)). Here, I have determined that the arrest was not supported by probable cause because Tinsley was not acting in the performance of his duties "at the time of the interference or assault." (ECF No. 139 at 24.) Thus, the proper formulation of the qualified immunity question is whether, at the time of the incident, there was clearly established law holding that Tinsley's actions fell outside the performance of his duties.

The question whether J.M.'s Fourth Amendment rights were violated depends on whether there was probable cause to believe J.M. had violated two Connecticut statutes—Conn. Gen. Stat. §§ 53a-167a and 53a-167c. Where the alleged violation of a constitutional right "turns on an analysis of state, rather than federal law," "it is the state courts' interpretation of the law that is most significant." *Chipperini v. Crandall*, 253 F.Supp.2d 301, 307–8 (D. Conn. 2003). Moreover, "[w]hile most cases defining the analysis of the 'clearly established' right focus on whether

decisional law adequately defines the contours of the right at issue, statutes can also be a source." *Id.* at 309; *see also Poulakis v. Rogers*, 341 Fed. Appx. 523, 529 (11th Cir. Aug. 10, 2009) (analyzing whether officers had qualified immunity from plaintiff's Fourth Amendment claim for false arrest, court looked to decisions of Florida Supreme Court and text of Florida statute to determine whether there was probable cause to arrest for carrying an unlawfully concealed firearm, in violation of Florida law); *Campbell v. Peters*, 256 F.3d 695, 700–1 (7th Cir. 2001) (in deciding that defendant prison officials had qualified immunity with respect to plaintiff's Eighth Amendment claim that he was kept in prison a year longer than his sentence required, court found that state statute did not "clearly establish the rules for computing release times" and that state trial court decision interpreting state statute governing good time credit did not constitute clearly established law). "As the Supreme Court indicated, the salient question is whether the state of the law gave the officers fair warning that their alleged treatment of the plaintiff was unconstitutional." *Chipperini*, 253 F. Supp.2d at 309 (internal alterations and quotation marks omitted; citing *Hope v. Pelzer*, 536 U.S. 730, 740–41 (2002))

As of the November 2012 incident, there was Connecticut Supreme Court precedent specifically interpreting the "performance of duties" element of both Sections 53a-167a and 53a-167c. As already discussed, in *State v. Davis*, 261 Conn. 553, 565–72 (2002), the court held that the trial court should have instructed the jury that, "in determining whether the police officers were acting within the scope of their duties" under Sections 53a-167a and 53a-167c, "[the jury] should apply General Statutes § 53a-22(b)," which provides that a police officer "is justified in using physical force upon another person when and to the extent that he or she reasonably believes such to be necessary to" arrest someone "whom he or she reasonably believes to have committed an offense" or "defend himself or herself or a third person" from the use of physical force. *Davis*

made clear that "if the police officer does not reasonably believe that his use of physical force is necessary, then his use of force is not within the performance of his duties and a citizen may properly resist that use of force." *Id.* at 570–71. And the statutes on which the *Davis* court relied were enacted decades before the incident in this case, in substantially the same form as they existed in 2012. *See* Conn. Gen. Stat. §§ 53a-167a and 53a-167 (requiring officer to be acting in performance of duties; enacted in 1971); § 53a-22(b) (defining when use of physical force by officer is justified; enacted in 1969 to take effect in 1971).

It is true that *Davis* did not involve the specific factual situation confronting Tinsley—a call to assist a DCF caseworker in the handling of a child. Rather, *Davis* involved an officer's altercation with a defendant who refused to leave the area in front of a corner grocery store after the officer had instructed a group of individuals gathered there to disperse. *Davis*, 261 Conn. at 556–57. But "officials can still be on notice that their conduct violates established law even in novel factual circumstances," and there is "no requirement that previous cases be 'fundamentally similar'" or involve "materially similar facts" *Hope*, 536 U.S. at 741. Tinsley had "fair warning" that he could not use physical force against another if he was not arresting or detaining that person for a crime, protecting someone from harm, or preventing an escape. If anything, it should have been *more* obvious to Tinsley than to the officer in *Davis*—who was dealing with adults congregated on a street corner—that he was not acting in the performance of his duties when using force to drag from his home a 12-year-old boy who had committed no crime and posed no threat to anyone. *See United States v. Lanier*, 520 U.S. 259, 271 ("[G]eneral statements of the law are not inherently incapable of giving fair and clear warning . . . . The easiest cases don't even arise. There has never been a section 1983 case accusing welfare officials of selling forster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages

. . . liability." (internal quotation marks and citations omitted.)).

### 2. Objectively reasonable action

Once it is determined that the law was clearly established, the analysis moves to whether an objectively reasonable officer would have thought that Tinsley's actions violated it. Qualified immunity protects Tinsley from damages on the false arrest claim if he can establish that he had "arguable probable cause" to arrest J.M. *Zalaski v. City of Hartford*, 723 F.3d 382, 390 (2d Cir. 2013) (internal quotations omitted), that is, "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Id.*; *see also Pizarro v. Kasperzyk*, 596 F. Supp.2d 314, 319 (D. Conn. 2015).

As already suggested, Tinsley cannot meet these standards.  It would have been obvious to a reasonable officer faced with J.M on November 15, 2012, that using force to drag this reluctant twelve-year-old boy from his home to attend a psychological evaluation was not necessary to make an arrest or to protect himself or anyone else; and officers of reasonable competence could not disagree that doing so would fall outside the performance of an officer's duties, as the performance element was set forth in the relevant statutes and *Davis*.

Tinsley's testimony that he believed the Notice of Evaluation was a "court order" that required J.M to attend the evaluation does not change this analysis. Whatever the juridical status of the "Notice of Evaluation," it did not authorize the use of force.  As Tinsley acknowledged, it was not an arrest warrant or a take-custody order.  The document was  issued by the "office of the clerk" of the Superior Court, was not signed by a judge, was not directed to the police, and made no reference to force, arrest, seizure, or even penalties for non-compliance. Nor did it bear any resemblance to a capias or suggest that J.M. had missed a previous court hearing. *Compare Milner*

*v. Duncklee*, 460 F. Supp.2d 360 (D. Conn. 2006) (officers who arrested plaintiff in his home pursuant to a capias issued by a judge due to the plaintiff's failure to attend a child support hearing violated plaintiff's Fourth Amendment rights because capias, though authorizing arrest, did not authorize arrest in the home; officers nonetheless had qualified immunity because the law was not clearly established at the time whether a capias authorized arrest in the home). In short, nothing in the document remotely suggests that a police officer was authorized to use force to compel compliance with it, any more than a routine order I might sign scheduling a hearing in a civil case could be construed to authorize U.S. Marshals to round up the parties and bring them to the courtroom in handcuffs to make sure they attended. No reasonably competent officer could think that the Notice of Evaluation—whether it was a "court order" or not—authorized him to drag from his home a child who posed no threat and had committed no crime.

Because the relevant law was clearly established and because any objectively reasonable officer would have known that Tinsley's actions violated that law, Tinsley is not entitled to qualified immunity on the Fourth Amendment false arrest claim.

### ii. Excessive Force Claim

"It was clearly established at the time of this incident that a police officer could not lawfully apply a degree of force to an individual that was unreasonable in light of the totality of the circumstances." *Weather*, 2011 WL 1046165, at *10 (citing *Saucier*, 533 U.S. at 201–2). The Second Circuit has stated that, in cases like this one, the reasonableness analysis of excessive force claims and the reasonableness analysis of the resulting qualified immunity determination "ultimately converge on one question: Whether in the particular circumstances faced by the officer, a reasonable officer would believe that the force employed was lawful." *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 764 n.7 (2d Cir. 2003). "Even officers who are found to have used

excessive force may be entitled to an extra layer of protection from the 'sometimes hazy border between excessive and acceptable force.'" *Stephenson v. Doe*, 332 F.3d 68, 77 (2d Cir.2003) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "The relevant inquiry [for the extra layer of protection] 'is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Stephenson*, 332 F.3d at 77 (quoting *Saucier*, 533 U.S. at 202).

Largely for the same reasons discussed above, i.e., that it would have been obvious to a reasonable officer that using force to drag J.M. from his home was not necessary to make an arrest or to protect anyone, it would have been clear to a reasonable officer that the amount of force Tinsley used was excessive. Force was not authorized by the Notice of Evaluation, and there was nothing about the situation—no crime, no escape, no threat to anyone's safety, and no basis to arrest or detain—that created an urgent need for its use.

f.  Other claims

Huaman also brought claims of intentional and negligent infliction of emotional distress against Tinsley and a claim of negligent infliction of emotional distress against the Town under Connecticut General Statute § 52-557n. I do not find that the jury's verdict on any of these claims was against the weight of the evidence or seriously erroneous.

Among other things, these claims all required the jury to find that Tinsley's actions caused emotional distress to J.M.; the negligent infliction of emotion distress claim also required it to find that Tinsley "should have known that it was likely that a reasonable person under the circumstances would be distressed by the conduct and that that distress might result in illness or bodily injury." (ECF No. 139 at 31.) There was nothing so compelling about J.M.'s or Huaman's testimony, or that of the damages witnesses Huaman called, that a finding by the jury that J.M. did not suffer significant emotional distress from the incident would have been against the weight of the

evidence. There was evidence at trial that the incident happened quickly, that Tinsley was unaware of J.M's mental disabilities, and that, by the time of trial, J.M was performing well socially and in school—considerably better than before the incident. While there was some evidence that J.M had suffered emotional distress as well, the evidence as a whole was not so one-sided that it would have been seriously erroneous for the jury to find against the plaintiff on the emotional distress components of these claims. I will thus not order a new trial on these claims.

As for the Town of East Hartford, the jury was instructed that a finding in Tinsley's favor on the negligent infliction of emotional distress claim precluded a finding that the Town was liable. § 52-557n; (ECF No. 139 at 33.) Thus, the verdict on this claim was not seriously erroneous either.

## IV. Conclusion

For the reasons set forth above I DENY Huaman's Rule 50 motion for judgment as a matter of law. I GRANT Huaman's Rule 59 motion for a new trial on the false arrest, false imprisonment, malicious prosecution, and excessive force claims, and I DENY the motion for a new trial on all other claims.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.


Dated:        Hartford, Connecticut
              September 28, 2017